# IN THE COURT OF APPEALS OF IOWA

No. 18-1390
Filed November 7, 2018

**IN THE INTEREST OF T.J.M.,**
**Minor Child,**

**S.M.N. and J.N., Intervenors,**
    Appellants.

_____

Appeal from the Iowa District Court for Linn County, Susan Flaherty, Associate Juvenile Judge.

Intervenors appeal the juvenile court decision removing the Iowa Department of Human Services as the guardian of a child and placing the child in the guardianship of other relatives. **REVERSED AND REMANDED.**

Ellen R. Ramsey-Kacena, Cedar Rapids, for appellants S.M.N. and J.N.

Angela M. Railsback of Railsback Law Office, Cedar Rapids, for intervenors B.W. and J.W.

Thomas J. Miller, Attorney General, and Mary A. Triick, Assistant Attorney General, for appellee State.

Melody J. Butz of Butz Law Offices, PC, Center Point, guardian ad litem for minor child.

Considered by Potterfield, P.J., and Bower and McDonald, JJ.

**BOWER, Judge.**

Intervenors S.M.N. and J.N. appeal the juvenile court decision removing the Iowa Department of Human Services (DHS) as the guardian of a child and placing the child in the guardianship of other relatives. We conclude DHS did not act unreasonably, irresponsibly, or contrary to the best interests of the child when it determined the child should be permanently placed in the home of the maternal aunt. We reverse the juvenile court's decision removing DHS as the guardian of the child and placing the child in the guardianship and custody of the maternal great-uncle.

### I.    Background Facts & Proceedings

S.M., mother, and T.J., father, are the parents of T.J.M., born in 2013. The mother has another child, S.J.M., who was born in 2014. The children were removed on April 7, 2016, due to the parents' use of illegal drugs and domestic violence in the home. T.J.M. was placed with an aunt, Se.M. S.J.M. was placed with her father, J.S.

On April 10, 2016, S.M. gave birth to Z.M.S. The father of Z.M.S. is W.G. The child was born prematurely and had extensive medical problems. Z.M.S. tested positive for methamphetamine at birth and was removed from the mother's care. Z.M.S. was placed with a maternal aunt, S.M.N., and her husband, J.N.[1]

Se.M. informed DHS she did not intend to be a long-term placement for T.J.M. Initially, S.M.N. stated she did not believe she could care for T.J.M. due to the extensive care Z.M.S. needed. The DHS caseworker, Debby Bailey,

---

[1] We will refer to S.M.N. and J.N. together as the maternal aunt.

approached a maternal great-uncle, B.W., and his wife, J.W.,[2] who stated they could not take T.J.M. immediately because they were moving. In January 2017, Bailey decided to move T.J.M. to the home of the maternal great-uncle, based on her belief T.J.M. and Z.M.S. should be in separate homes so they could each get more individual attention. Within a few days, the maternal aunt stated Z.M.S. had improved to the point where she could also care for T.J.M. Bailey decided not to move T.J.M. at that time, stating the child's permanent placement would be determined later. She testified she knew she did not have the ability to determine the child's permanent placement and this decision would be made by the DHS adoption unit.

On July 28, 2017, the juvenile court terminated the parental rights of S.M., T.J., and W.G.[3] The termination order provided:

> That custody and guardianship of the children is placed with the Department of Human Services for purposes of continued placement according to the prior orders of this Court and for preadoptive placement. The Department of Human Services is ordered to prepare an amended case permanency plan within thirty days of the date of this order setting out the change to termination of parental rights and preadoptive placement.

The court determined S.J.M. "shall continue in the care and custody of her father," J.S.

After the termination, both the maternal great-uncle and maternal aunt expressed an interest in adopting T.J.M. The case was transferred from Bailey to Brianne Arends, who worked in the DHS adoption unit. Based on Iowa Code

---

[2]  We will refer to B.W. and J.W. together as the maternal great-uncle.
[3]  S.M. appealed the termination of her parental rights. The juvenile court's decision was affirmed on appeal. *See In re T.J.M.*, No. 17-1285, 2017 WL 4570514, at *2 (Iowa Ct. App. Oct. 11, 2017).

section 232.108 (2017) and DHS guidelines, which state a preference for placing a child with siblings, Arends determined there needed to be serious consideration to having T.J.M. and Z.M.S. live in the same home. A physician stated Z.M.S. should not be exposed to pet dander and the maternal great-uncle has several pets, so Z.M.S. did not visit the great-uncle's home. Although T.J.M. had been spending some time in the maternal aunt's home on an informal basis, a formal visitation schedule was initiated in September 2017. T.J.M. developed a strong bond with Z.M.S. and the maternal aunt's family.

DHS issued a case plan on January 2, 2018, stating:

> After much contemplation regarding the best interest of both children, both in the short term and long term, the Department has officially selected [the maternal aunt] as the adoptive placement for both [T.J.M.] and [Z.M.S.]. This was a difficult decision based upon the amount of time [T.J.M.] has spent in the home of [the maternal great-uncle] and their great care of [T.J.M.] during the time she has been in their home. The decision was made for the following reasons:
>
> (1)    [The maternal aunt] had expressed a desire to be a placement option for [T.J.M.], including at court early on in the case; however, for unknown reasons [T.J.M.] was not placed with [the maternal aunt] at that time. [The maternal aunt] has shown a desire and ability to maintain a relationship with [T.J.M.] while [T.J.M.] was placed with [the maternal great-uncle]
>
> (2)    Each party has expressed that [T.J.M.] and [Z.M.S.] are bonded and that they love each other. It is apparent from this worker's direct observation that this is true. While each of the children was born prematurely and [Z.M.S.] was born positive for methamphetamine, they do not have current special needs that prevent them from being able to be located together safely and still have each of their individual needs met. [The maternal aunt] ha[s] expressed that [she is] aware of behaviors that could develop and [is] prepared to handle them if they do by reaching out to community resources and other family members as needed.
>
> (3)    [T.J.M.] appears comfortable with [the maternal great-uncle] and provides them with affection and also appears comfortable with [the maternal aunt] and provides them with affection. [T.J.M.] appears to love and is bonded to both couples. [T.J.M.] appears to be capable of secure attachments and has

developed this type of attachment with both couples, and it appears that she identifies that regardless of where she is staying her needs will be met. For this reason, the Department has determined that while [T.J.M.] will be sad and will miss [the maternal great-uncle], it will not be unduly difficult for her to transition fully into [the maternal aunt's]'s care on a permanent basis. This transition will be made even easier if both couples remain committed to maintaining family connections for [T.J.M.] throughout the transition and post-adoption.

The maternal great-uncle filed a motion to intervene in the juvenile court proceedings. He claimed T.J.M. began "showing signs of significant emotional stress and trauma," when DHS increased her visits with the maternal aunt and asked to have the visits stayed. The maternal great-uncle claimed DHS should be removed as the custodian and guardian of T.J.M. and the child should be placed in his custody. DHS resisted the motion to intervene, noting T.J.M. had "already been informed of the selection decision and ha[d] already started to transition into the selected home." Additionally, the maternal aunt filed an application to intervene and requested T.J.M. be immediately placed in her care. The guardian ad litem (GAL) recommended T.J.M. remain with the maternal great-uncle, stating Z.M.S. had significant medical needs and because of this T.J.M. may not get adequate attention in the home of the maternal aunt.

A combined hearing on these matters was held over a period of three days. Testimony was provided by B.W., J.W., S.M.N., J.N., J.S., Se.M., Bailey, Arends, the child's preschool teacher, an expert on sibling bonds, and a former DHS worker who assessed only the bond between T.J.M. and the great-uncle.

The juvenile court entered a decision on July 30, 2018. The court stated, "[T.J.M.] has two sets of appropriate, loving maternal relatives seeking to adopt her." The court found, however, the maternal great-uncle had been led to believe

if T.J.M. was not returned to her mother, she would be permanently placed with him. The court concluded:

> [T]he actions of the Department of Human Services in disrupting the concurrent plan for this child was not reasonable under the circumstances. It is not reasonable that a concurrent plan developed and, in fact, implemented, by the Department of Human Services prior to the termination of parental rights, is then discarded as not in the child's best interest, by the same Department of Human Services in the adoption selection process. . . . [DHS] should provide consistency in the decision making for the life of the case, particularly in critical areas that affect attachments and bonding. Here, clearly, that continuity in decision making and concurrent planning failed and such a failure is unreasonable under the circumstances.

The court determined DHS should be removed as the guardian of the child and the maternal great-uncle should be granted custody and guardianship of T.J.M. The maternal aunt appealed the decision of the juvenile court.

## II. Standard of Review

"Our review of this juvenile case is de novo." *In re E.G.* (*E.G. II*), 745 N.W.2d 741, 743 (Iowa Ct. App. 2007). "We review both the facts and the law and adjudicate rights anew." *Id.* "Although we give weight to the juvenile court's findings of fact, we are not bound by them." *Id.*

## III. Removal of Guardian

Throughout the juvenile court proceedings, T.J.M. was under the guardianship of DHS. We have stated, "The legislature, while giving the juvenile court continuing oversight consistent with the best interest of the child, did not give the juvenile court the right to establish custody or consent to adoption. Rather, these rights were specifically granted to the guardian." *In re E.G.* (*E.G. I*), 738 N.W.2d 653, 657 (Iowa Ct. App. 2007). When DHS is a child's guardian, it determines the specific adoptive home for the child. *Id.* The juvenile court has the

ability to monitor the placement, but it does not have the authority "to direct a *specific* placement." *Id.*; *accord In re C.D.P.*, 315 N.W.2d 731, 733 (Iowa 1982).

In order to divest DHS of this responsibility, it must be removed as the child's guardian. *See E.G. I*, 738 N.W.2d at 657 n.10 (noting a procedure for removal of a guardian in juvenile court proceedings). The removal of a guardian is governed by section 232.118(1), which provides, "Upon application of an interested party or upon the court's own motion, the court having jurisdiction of the child may, after notice to the parties and a hearing, remove a court-appointed guardian and appoint a guardian in accordance with the provisions of section 232.117, subsection 3."

In considering whether DHS should be removed as the guardian of a child, we have looked at whether it has engaged in "unreasonable actions." *E.G. II*, 745 N.W.2d at 744. We have also looked at whether "the Department in any way failed in its guardianship duties or in looking out for [the child's] best interests." *Id.*; *accord In re S.O.*, No. 13-0740, 2013 WL 3458216, at *2 (Iowa Ct. App. July 10, 2013) ("The juvenile court retains the authority to remove DHS as guardian if the department acts unreasonably or irresponsibly in discharging its duties."). The actions of DHS "must serve the best interests of the child." *In re N.V.*, 877 N.W.2d 146, 153 (Iowa Ct. App. 2016); *accord In re C.L.C.*, 479 N.W.2d 340, 345 (Iowa Ct. App. 1991) (noting "the overall principle of chapter 232 [is] to seek the best interests of the child").

We turn then to the issue of whether DHS acted unreasonably, irresponsibly, or contrary to the child's best interests in this case. In making its determination of the best placement for a child, DHS is required to follow section 232.108, which provides:

> (1)     If the court orders the transfer of custody of a child and siblings to the department or other agency for placement under this division, . . . the department or other agency shall make a reasonable effort to place the child and siblings together in the same placement.  The requirement of this subsection remains applicable to custody transfer orders made at separate times and applies in addition to efforts made by the department or agency to place the child with a relative.
>
> (2)     If the requirements of subsection 1 apply but the siblings are not placed in the same placement together, the department or other agency shall provide the siblings with the reasons why and the efforts being made to facilitate such placement, or why making efforts for such placement is not appropriate.

Iowa Code section 232.108(1) "requires the department to 'make a reasonable effort to place the child and siblings together in the same placement.'" *In re J.B.*, No. 18-1177, 2018 WL 4362753, at *2 (Iowa Ct. App. Sept. 12, 2018) (quoting Iowa Code § 232.108(1)).  "[T]he importance of sibling relationships has been statutorily recognized in section 232.108." *In re M.D.*, No. 17-1893, 2018 WL 739351, at *2 (Iowa Ct. App. Feb. 7, 2018).  "[T]he overall thrust of section 232.108 [is] to maintain sibling relationships absent clear and convincing evidence it would be detrimental." *In re A.J.*, No. 13-0216, 2013 WL 1227360, at *3 (Iowa Ct. App. Mar. 27, 2013).

DHS followed this statutory mandate and determined T.J.M. and Z.M.S. should be placed together if feasible.[4]  It determined there might be short-term problems for T.J.M. in moving her from the home of the maternal great-uncle but concluded it would be in her long-term best interests to grow up in a home with her

---

[4]  The children's other sibling, S.J.M., lived with her father, J.S., who was not the father of T.J.M. or Z.M.S.  J.S. testified he was not in a position to be a permanent placement for T.J.M. or Z.M.S.  He stated S.J.M. should have visits with her siblings, and both the maternal aunt and maternal great-uncle agreed there should be visits between all of the siblings.

sibling. The juvenile court did not find the home of the maternal aunt was unsuitable, stating:

> [T.J.M.] has two sets of appropriate, loving maternal relatives seeking to adopt her. Each family clearly loves [T.J.M.] and has a bond with her. They each have the ability to provide a home and meet the child's basic needs. Each prospective adoptive family also has a biological connection to [T.J.M.'s] mother. There are pros and cons to each potential placement.

The court also found:

> Although there has been speculation that [Z.M.S.'s] medical needs would prevent the [maternal aunt] from adequately caring for [T.J.M.], there is no convincing evidence to support the conclusion that [T.J.M.] has been unsafe or uncared for while with the [maternal aunt] or that [Z.M.S.'s] needs have taken priority over [T.J.M.'s] when she is in the [maternal aunt's] home.

The juvenile court did not conclude DHS failed to act in the child's best interests when placing the child in the home of the maternal aunt.

Instead, the court's decision finding DHS acted unreasonably was based on its disagreement with the process through which the decision was made. The court specifically found the maternal great-uncle had been led to believe the placement of T.J.M. in his home would be permanent. The court found DHS "should provide consistency in the decision-making for the life of the case, particularly in critical areas that affect attachments and bonding." The court's conclusions ignore the work of the DHS adoption unit in the process.

A similar situation was addressed in *E.G. II*, 745 N.W.2d at 742, where a foster mother who had cared for a child for a lengthy period of time challenged DHS's decision to place the child with a different family for adoption. We recognized the foster mother's bond with the child but stated this did not give her any enforceable rights to the child. *Id.* at 744. We affirmed the decision of DHS,

finding "[t]here is no evidence the Department in any way failed in its guardianship duties or in looking out for [the child's] best interests." *Id.*; *accord In re R.S.*, No. 15-1244, 2015 WL 5578273, at *1 (Iowa Ct. App. Sept. 23, 2015) (noting DHS does not have a statutory duty "to preserve a pre-adoptive foster care placement following removal of the child from the placement").

Although *E.G. II* and *R.S.* involve foster parents rather than a relative placement, these cases show there is no statutory authority giving the maternal great-uncle as the placement for the child during the juvenile court proceedings any greater rights to the child than the maternal aunt. We determine the juvenile court improperly found DHS acted unreasonably by not giving more deference to the maternal great-uncle because the child had been previously placed in his care.

In addition, we note the lengthy statement given by DHS in support of its decision shows the decision to move T.J.M. to the home of the maternal aunt was not made lightly. We do not agree with the court's findings DHS made an "abrupt change." DHS's decision, as guardian of T.J.M., was made after considering several relevant factors in an attempt to act in the child's best interests. We also note Z.M.S.'s medical concerns, which were the primary reason T.J.M. and Z.M.S. were initially placed separately, have now largely abated.

In our de novo review of the facts and the law, we conclude DHS did not act unreasonably, irresponsibly, or contrary to the best interests of T.J.M. when it determined the child should be permanently placed in the home of the maternal aunt. We reverse the juvenile court's decision removing DHS as the guardian of the child and placing the child in the guardianship and custody of the maternal

great-uncle.  We remand with directions to the court to reinstate DHS as the guardian of T.J.M.

**REVERSED AND REMANDED.**